J-S64018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: D.Y.S. & E.M.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.J.H., NATURAL MOTHER | No. 1023 MDA 2015 |

Appeal from the Order Entered on May 13, 2015
In the Court of Common Pleas of Adams County
Juvenile Division at Nos.:     RT-25-2014(B)
                                              RT-26-2014(B)

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED NOVEMBER 06, 2015**

T.J.H. ("Mother") appeals the May 13, 2015 order that terminated her parental rights to D.Y.S. (born in September 2012) and E.M.S. (born in September 2013) (collectively "Children").  We affirm.

The trial court made the following findings of fact that summarize the factual history and the hearing on the petition for termination of parental rights:

> 1.     [In September 2012, D.Y.S.] was born.  At that time Mother was age 17 and living in the foster home of [T.W.] as a dependent child.  She had been there since November 2011. [A.S.G. ("Father")] was listed as the paternal parent on the birth certificate.  [T.W.] reported that Mother was attentive to [D.Y.S.'s] needs while in her home.

---

[*]     Former Justice specially assigned to the Superior Court.

2.    On November 15, 2012, Mother turned age 18 and left foster care to reside with Father's family.

3.    On April 3, 2013, Mother appeared at [Adams County Children & Youth Services ("ACCYS")] and reported that she was pregnant and not getting along with Father's family. Independent living was discussed with her and within one week she, Father and [D.Y.S.] were residing in an Independent Living apartment.

4.    In August, 2013, Mother and Father were asked to leave the Independent Living apartment because they were not following the rules.

5.    On September 4, 2013, the parents voluntarily agreed to place [D.Y.S.] with ACCYS for a period of no longer than 30 days because "the family is currently homeless, working through differences and feel that it is in the best interest of the child to be placed while they are working toward stability."  The child was placed in the Selby foster home in East Berlin, Adams County, Pennsylvania.

6.    On September 20, 2013, [E.M.S.] and his sister, [E'm.S.], were born prematurely (29 weeks gestation) at York Hospital and were placed in the [Neonatal Intensive Care] Unit.  Father was not identified as the paternal parent on the birth certification but he subsequently acknowledged paternity.

7.    Thereafter, Mother did not get to the hospital often because she lacked transportation.  When able to get there, she would interact with the twins as much as possible.

8.    On October 4, 2013, ACCYS took custody of [D.Y.S.] because the 30-day voluntary placement had expired and the parents were still homeless.

9.    On October 5, 2013, Mother was cited for driving without a license, driving an unregistered vehicle and operating a vehicle without proper inspection.  She entered pleas of guilty to each offense on November 18, 2013.

10.    On October 7, 2013, the Juvenile Court of Adams County conducted an informal shelter care hearing for [D.Y.S.].  The parents did not appear.  The court directed that the child remain in foster care.  The parents appeared at [ACCYS] later and reported they had been pulled over for having no registration or

insurance on their vehicle even though records indicated that the event took place two days earlier.

11. On October 8, 2013, ACCYS filed a Dependency Petition . . . alleging [D.Y.S.] was a dependent child.

12. On October 15, 2013, ACCYS withdrew the Dependency Petition . . . and [D.Y.S.] was returned to the custody of Mother who was living with [D.W. and G.W. ("Foster Parents")] in McSherrystown, Pennsylvania.

13. [T.W.] went with Mother to York Hospital to see the twins on three occasions and observed her as being attentive to them.

14. On October 31, 2013, Father was charged with Burglary, Aggravated Assault, Criminal Trespass and Simple Assault as a result of an incident occurring that date. Bail was set and Father was incarcerated.

15. On October 31, 2013, Mother moved from [Foster Parents'] home.

16. On November 12, 2013, ACCYS took custody of [E.M.S.] and [E'm.S.] for the reason that "since birth, the parents continue to have unstable housing, the mother has vacillated between giving up the child[ren] for adoption and caring for the child[ren], the mother's plan for housing and support has changed from week to week, the child[ren are] ready for discharge and the mother could not present a solid plan to care for the child[ren]."

17. On November 13, 2013, the proposed foster mother, [Mrs. H.], completed the discharge training for the twins and they were moved to that foster home.

18. On November 13, 2013, Mother returned to [Foster Parents'] home.

19. On November 13, 2013, Father informed the caseworker that he [did] not want to see the children.

20. On November 15, 2013, the Juvenile court conducted a Shelter care hearing for [E.M.S.] and [E'm.S.]. The parents were present. It was alleged that . . . Father was incarcerated, that Mother's circumstances were unstable and she did not have a specific plan for the children. [E.M.S. and E'm.S.] were maintained in foster care.

21. On November 26, 2013, the Juvenile Court conducted an Adjudication Hearing for [E.M.S.] and [E'm.S.]. Both parents were present. At that time, the court determined that the parents had very limited contact with the children prior to their discharge from the Neonatal Intensive Care Unit on November 13, and the hospital would not discharge them to the custody of their parents due to their lack of contact and failure to complete expected training for premature children. Mother was 19 years of age, living with her former foster mother, [G.W.], was unemployed, did not have a driver's license or vehicle and had recently pled guilty to charges of driving without a license, invalid inspection and driving an unregistered vehicle. The twins had a lot of special requirements due to their premature birth. Mother indicated that she wanted to provide the care for the children even though she had not completed the aforementioned training nor demonstrated the expectations for caring for children born prematurely. Father was incarcerated and unable to care for the children. The court continued [E.M.S. and E'm.S.] in foster care.

\* \* \*

23. On December 6, 2013, [ACCYS] conducted a family meeting to discuss moving the twins to [Foster Parents'] home. Mother was present but reportedly uncooperative with providers. A plan was discussed for Mother to work on her mental health, stability and parenting and for more visits to occur with the twins before they would be transitioned to Mother. She did visit with the twins that day.

24. On December 9, 2013, Mother and [Foster Mother] attended a visit with the twins.

25. On December 10, 2013, the Juvenile Court conducted a Dispositional Hearing . . . . Both parents were present. The parties agreed to the recommended dispositional plan. A primary permanency goal of reunification and a concurrent goal of adoption were established. The plan called for Mother to:

  a. Maintain contact and cooperation with ACCYS;

  b. Attend to her mental health by participating in counseling and/or medication management;

  c. Consistently demonstrate appropriate parenting skill; and

- 4 -

d. Establish and maintain stability regarding transportation, housing and employment.

Mother was still residing in the [Foster Parents'] home. It was understood that Mother and [Foster Mother] would complete neonatal discharge type training and when that was completed the twins would be transitioned to the [Foster Parents'] home.

26. On December 24, 2013, the twins moved to the [Foster Parents'] home.

27. After the move, Mother had difficulty caring for [D.Y.S.] and the twins at the same time. More often than not, [Foster Mother] would take care of [E.M.S.'] feeding, bathing, dressing and diapers while Mother cared for the other children.

28. In early January 2014, Mother became employed at a factory where she worked Sunday, Monday and Tuesday plus alternating Saturdays from 6:00 P.M. to 6:00 A.M. While Mother was working, [Foster Mother] would care for all the children. Mother was fired before the end of the month for not appearing.

29. On January 21, 2014 [E'm.S.] died at the foster home of [an] undetermined cause. Mother left the [Foster Parents'] home that same day and then spent time with Father's family. Thereafter, she would call the foster home to see how [E.M.S.] was doing.

30. On January 28, 2014, Mother returned to the [Foster Parents'] home and a dispute arose over [D.Y.S.] playing with a feminine hygiene product. The incident escalated and resulted in Mother being escorted off the property by the police. She moved to the home of Father's parents.

[Mother attended two visits in February 2014 with E.M.S.]

34. On February 18, 2014, the Juvenile Court conducted a Permanency Hearing regarding [E.M.S.]. Both parents were present. The child was residing in the [Foster Parents'] home and doing well. At that time, the Foster Parents were reportedly not interested in being a permanent resource for the child. Mother was homeless, unemployed, had no transportation, had [D.Y.S.] in her custody and had not followed up with mental health services. [E.M.S.] was continued in foster care.

\* \* \*

36. On February 26, 2014, Mother began residing in an apartment [on] Chambersburg Street, Gettysburg provided by ACCYS's Independent Living program.

37. Mother attended visits with [E.M.S.] on March 5, 12 and 19, 2014 but was late for the visits on the 5th and 19th.

38. On March 12, 2014, Mother reported that she was employed at McDonald's.

* * *

41. On March 31, 2014, ACCYS took custody of [D.Y.S.] because Mother indicated she could not care for the child at that time and she did not have family resources willing to care for him. Mother requested that [D.Y.S.] be placed in the [Foster Parents'] home where [E.M.S.] was residing. At this time, Mother was still living in the Independent Living apartment and Father was incarcerated at SCI-Camp Hill.

42. On April 2, 2014, Mother did not attend the scheduled visit.

* * *

44. On April 3, 2014, ACCYS filed a Dependency Petition . . . alleging that [D.Y.S.] was a dependent child.

45. On April 9, 2014, Mother did not attend the scheduled visit because she was incarcerated.

* * *

48. On April 15, 2014, the Juvenile Court conducted an Adjudication Hearing . . . for [D.Y.S.]. Mother was present and Father participated by telephone from SCI-Laurel Highlands. Mother agreed that she had requested [D.Y.S.] be placed in foster care because she was not able to care for him at that time. She had also not taken him for his one-year medical checkup or other periodic wellness checkups. Father was not able to confirm or deny many of the allegations but agreed that he was serving a minimum sentence of 18 months and then was facing federal deportation. Mother requested that [D.Y.S.] be placed in a different foster home, but [ACCYS] recommended that he remain with [E.M.S.]. The court agreed to keep [D.Y.S.] in the [Foster Parents'] home.

49.   Mother attended visits with the children on April 14, 16, 21 and 23 but was late on the 14th and 16th.  On April 21, Mother was observed "hitting" [D.Y.S.].  On April 23, Mother was observed on her cell phone for most of the visit.

50.   On April 28, 2014, Mother tested positive for THC (marijuana).

51.   Around this time, Mother lost her job at [McDonald's].

[Mother missed visits on April 28 and 30, 2014.]

54.   In early May, 2014, ACCYS recommended to Mother that she enroll in Haven Home in York but she refused to make the initial call.  Around this time, Mother did agree to participate in the Incredible Years parenting program.  She attended 4 of 5 sessions before leaving the area and never finished the instruction.

55.   On May 5 and 7, 2014, Mother attended scheduled visits with the children.  On May 5, Mother was observed using intimidation with [D.Y.S.], texting on her cell phone, and not checking diapers.  On May 7, Mother seemed moody and indicated that she could not wait to get to "D.C." to go "clubbing."

56.   On May 5, 2014, Mother was provided a letter from the caseworker setting forth a visitation schedule for May 7, 12, 14, 21, and 28.  Mother was also advised about [ACCYS] concerns regarding Mother's actions with the children during the visit on April 21; specifically as to "rough" discipline with [D.Y.S.] and placing [E.M.S.] flat on the floor to feed himself with a propped bottle.

57.   On May 7, 2014, Mother was removed from the Supervised Independent Living apartment for a second time for not following the rules.

58.   The following day, Mother moved to Washington, D.C. At [that] time, she was depressed over the loss of [E'm.S.].

59.   On May 15, 2014, the Juvenile Court conducted a Status Review [for E.M.S.] and a Disposition Hearing [for D.Y.S.]. Mother participated by telephone but Father did not participate. Mother was then living in Washington, D.C., with an aunt and cousin and reported that she was to begin employment at a restaurant the following day.  With regard to [E.M.S.], it was

reported that during visits Mother would hold, feed or change the child's diapers and that he seemed to enjoy her company but that Mother was not particularly responsive to redirection by others. . . . [T]he permanency goal for [D.Y.S.] was established as reunification with Mother along with a concurrent goal of adoption. ACCYS requested that Mother pursue mental health treatment to address family rejection, family violence and the death of her daughter. The court directed that Mother was to:

    a. Maintain contact and cooperation with [ACCYS];

    b. Attend to her mental health by participating in counseling and/or medication management;

    c. Consistently demonstrate appropriate parenting skills;

    d. Establish and maintain stability regarding transportation, housing, legal matters, drug free environment, and employment;

    e. Attend to her grief/loss trauma through out-patient counseling or medications; and

    f. Participate in a forensic psychological evaluation . . . when logistically able to do so.

60. Because Mother was in Washington, D.C., she did not appear for scheduled visits with the children on May 12, 14, 21, and 28, 2014.

61. During June and July, 2014, Mother did not have contact with ACCYS and had no visits with the children. There is no record that Mother called the children in May or June, however, she made at least two calls in July and two calls in August to the [Foster Parents'] home to speak with the children.

62. On July 8, 2014, the Juvenile Court conducted a Permanency Hearing . . . . Neither parent participated. At that time, it was reported that Mother's whereabouts were unknown and efforts to communicate with her had been unsuccessful. The aunt, with whom she reportedly was living, indicated to the caseworker that Mother was running the streets and was not employed. There were warrants for Mother's arrest. [For E.M.S.], the court changed the permanency goal to adoption with a concurrent goal of permanent legal custodianship with a nonrelative. This modification was based on the level of progress with [E.M.S.], Mother's lack of contact for two months

- 8 -

and Father's inability to be a resource. [D.Y.S.] was 20 months of age and was reportedly doing well in the foster home and referring to the Foster Parents as mom and dad. The court directed that both children remain in foster care.

63. On August 1, 2014, Mother contacted the caseworker and indicated that she would turn herself in on August 8 but first wanted a visit with the children.

64. On August 21, 2014, Mother returned to Pennsylvania and requested ACCYS to transport her from York. Mother's demeanor was reported to be erratic and her appearance disheveled. She was taken to a constable because of bench warrants and was incarcerated in the Adams County Adult Correctional Complex to satisfy financial obligations to a local magisterial district judge. She was released on September 7, 2014.

* * *

66. On September 4, 2014, the Juvenile Court received a letter from Mother dated September 1, and forwarded a copy to ACCYS. The stated purpose of the letter was to explain "some of the choices I have recently made." Mother wrote that after her daughter passed away she was feeling so much pain and guilt that she began "to smoke weed and drink." She left Pennsylvania after losing her independent living apartment and "I take fully responsibility for losing it." One month after moving in with her aunt "she kicked me out." Mother stated that she planned to continue sessions [with a counselor] "for my mental health services as soon as I get my medical coverage." She accused the foster mother of sabotaging her attempts to speak with [D.Y.S.] on the telephone. Mother also stated that she was "willing to allow [the children's] biological [paternal] grandmother [M.G.] to adopt them . . . . All in all judge I am accepting the fact that I am just not capable of caring for my children and relay hope that you will help me help their grandmother obtain full custody of my boys. . . . I have prayed about this and cried many nights just knowing I have failed my children miserably."

67. Around September 7, 2014, Mother was released from jail and began residing in a homeless shelter.

68. On September 9, 2014, a family meeting was arranged that involved Father's family, who indicated they wished to be a

resource for the children. However, the paternal grandmother and the balance of the members of her household were reportedly illegal immigrants; therefore, [ACCYS] did not feel it could look to that family for permanency. [ACCYS] was willing to guide the family toward resources that would assist them in changing their immigration status. Mother was present for that meeting and appeared to the caseworker to be in a healthy frame of mind. It was revealed that she had been on medication for anxiety and depression while incarcerated, which was allowing her to think more clearly. However, Mother did not continue with her medication after being released from incarceration.

69. Mother visited with the children for 2 hours each on September 12 and 29. The visit on September 12 was her first physical contact with the children since May 7, a period in excess of four months. She did provide snacks for the children.

\* \* \*

71. On October 1, 2014, Mother visited with the children but was observed yelling and cursing at [D.Y.S.].

\* \* \*

74. On October 14, 2014, the Juvenile Court conducted a Status Review . . . . Mother was not present but she was represented by counsel. Father participated by telephone from prison. It was reported that Mother was living at a local shelter and trying to secure housing. During October, Mother began employment at Kennies, a local supermarket, where her hours were Monday through Friday from 7:30 a.m. – 3:30 p.m. or 8:00 a.m. – 4:30 p.m. Mother did not have insurance or independent transportation. She had been provided a weekly visitation schedule. The children appeared to be doing well in the foster home and the Foster Parents were now willing to be a permanent resource for them. The parents were opposed to adoption and Mother wanted the children returned to her care. . . . The court directed that the children remain in the foster home.

[Mother missed two visits in October 2014.]

77. Mother visited with the children on October 29, 2014. During that time, the caseworker asked Mother what schedule would work for her in November. Mother did not have an answer

but indicated that she would call the caseworker with her availability.

78. On November 14, 2014, the caseworker called Mother because she had not been informed of Mother's availability for November visitation with the children.

\* \* \*

81. Mother stopped by the foster home on November 24, 2014. An argument arose when Mother became upset that the children referred to [Foster Father] as "dad". Mother was asked to leave the residence after about 10 minutes.

82. Mother visited with the children for 2 hours on November 26, 2014, but was observed to be engaged with her phone and not aware of some of the things the children were doing.

83. On December 9, 2014, the Juvenile Court conducted a Permanency Hearing . . . . Neither parent participated in the hearing. It was reported that Mother had quit her employment and continue[d] to reside in a local shelter. She was significantly in arrears to the Adams County Domestic Relations Office and avoided recent incarceration by borrowing a minimal sum of money to pay on the account. . . . The children were reported to be doing well in the foster home. The parents had been given the opportunity to grant permission for [E.M.S.] to be evaluated by Early Intervention but failed to follow through with that request[. T]herefore, the court was required to effectuate that permission. The court directed that the children remain in foster care.

\* \* \*

85. On December 11, 2014 the instant Petitions were filed. As of [that] date [D.Y.S.] had been in foster placement for 9 ½ months and [E.M.S.] had been in placement for 13 months.

\* \* \*

87. In December, 2014 the caseworker observed [D.Y.S.] becoming upset when Mother's name was mentioned.

\* \* \*

90. On January 13 and 31, 2015 Mother visited with the children for one hour each. Mother was observed as not being engaged with the children and left each session early.

\* \* \*

92. On February 12, 2015, Mother did not appear for her scheduled visitation with the children. That same day she tested positive for THC.

\* \* \*

94. On February 23 and March 30, 2015, Mother failed to appear for scheduled visits.

\* \* \*

96. On April 9, 2015 Mother did attend a scheduled visit. During the visit Mother asked [D.Y.S.] several times if he wanted to live with her and he responded negatively and identified [Foster Mother] as "my mommy." No attachment was observed between the children and Mother by the caseworker.

97. Overall from February 2014 to April 9, 2015 there were 33 visits scheduled for Mother and [E.M.S.] and 27 visits [of those visits included visitation with D.Y.S.]. Mother attended 20 of [E.M.S.'] visits (61%) and 14 of [those including D.Y.S.] (51%). She was late or left early for 7 visits, cancelled 2 visits and simply did not appear for 9 visits. Mother counters that if late she was relying on others for transportation and if she left early it was because she had to go to work.

98. The children recognize [Foster Parents] as their parent figures.

99. As of the date of the hearing on [the termination petitions, D.Y.S] has been in placement for 13 months and [E.M.S.] has been in placement for 18 months.

100. Overall, Mother has displayed a more aggressive approach toward [D.Y.S.] and a more affectionate approach with [E.M.S.].

101. The children do accept hugs and kisses from Mother but sometimes [D.Y.S.] will not return hugs to Mother.

102. When Mother and [Foster Parents] are in the same location the children seek out the Foster Parents. Mother acknowledges that [E.M.S.] does not know her well.

- 12 -

103. [D.Y.S.] has been observed not wanting to attend visits with Mother and [crying en route] but calm[ing] down during the actual visit.

104. [Foster Parents] are willing to adopt the children.

105. Kirsten Ritter, Permanency Specialist for the Bair Foundation, has been visiting with the children in the [Foster Parents'] home monthly since August 6, 2014. She has observed an attachment between the children and the [Foster Parents] and that the children are very comfortable in the [Foster Parents'] home. She noticed the children referring to the [Foster Parents] as mom and dad.

Trial Court Order & Opinion ("T.C.O."), 5/13/2015, at 2-18 (citations to record omitted; modifications to capitalization).

On May 13, 2015, the trial court terminated Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511 (a)(1) and (5) and (b) and additionally, to E.M.S pursuant to 23 Pa.C.S.A. § 2511(a)(8).[1] The court found that ACCYS had not met its burden of proof to terminate Mother's rights pursuant to 23 Pa.C.S.A. § 2511(a)(2). On June 10, 2015, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) for each child. On June 12, 2015, the trial court issued a statement pursuant to Pa.R.A.P. 1925(a) in which it concluded that Mother's issues on appeal were addressed in its May 13, 2015 order and opinion.

Mother raises the following issues for review:

_____

[1] Father's rights were terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

- 13 -

1. Whether the Trial Court abused its discretion and/or made an error of law when it concluded there was clear and convincing evidence presented to involuntarily terminate [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) when competent evidence provided that although [Mother] had been under severe emotional distress following the death of her infant daughter and, therefore, temporarily unable to perform her parental duties, this situation was improving at the time of the hearing.

2. Whether the Trial Court abused its discretion and/or made an error of law in concluding that there was clear and convincing evidence to involuntarily terminate [Mother's] parental right[s] pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) when the only issues cited by the Trial Court to support termination was [*sic*] [Mother's] housing and employment history and the testimony at the hearing established that the housing situation had been resolved.

3. [Mother has withdrawn this issue and we need not address it. *See* Mother's Brief at 24.]

4. Whether the Trial Court abused its discretion and/or made an error of law in concluding that there was clear and convincing evidence that involuntarily terminating [Mother's] parental rights would serve the best interests and welfare of the child(ren) when the court acknowledged there was no evidence presented of parental incapacity, neglect or abuse and the evidence regarding the child(rens) reluctance to visit with [Mother] was primarily provided by the foster parents who testified that they refuse to acknowledge [Mother] as "Mother" or even to speak of [Mother] in any capacity within their home.

5. Whether the Trial Court abused its discretion and/or made an error of law in concluding that there was clear and convincing evidence that involuntarily terminating [Mother's] parental rights would serve the best interests and welfare of the child(ren) (ages 2 ½ years and 19 months at the time of the hearing) when the pre-adoptive foster parents are advanced in age and testified to an unspecified "back up plan" which would require the children to move in with an unknown family member if/when they can no longer care for the children.

6. Whether the Trial Court abused its discretion and/or made an error of law in concluding that there was clear and convincing

> evidence that involuntarily terminating [Mother's] parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(8) for [E.M.S.] when the Trial Court held that the conditions which led to removal as related to the child's special needs are no longer an issue, there was competent evidence that [Mother's] housing had stabilized, and [Mother] testified to supports in place to assist with transportation.

Mother's Brief at 4-6.

Mother's issues 1, 2, and 6 address the trial court's decision pursuant to section 2511(a) and will be addressed together. Issues 4 and 5 involve the trial court's conclusions regarding Children's best interests pursuant to section 2511(b) and will be addressed together.

Our standard of review in termination of parental rights cases is as follows:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

> We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all

- 15 -

credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by clear and convincing evidence, which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511, which states, in pertinent part, as follows:

**(a) General rule. –** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable

- 16 -

period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations. –** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

The trial court found grounds to terminate Mother's parental rights pursuant to sections 2511(a)(1), (5), and (b) for Children and additionally, section 2511(a)(8) for E.M.S. However, this Court only needs to agree with the trial court's conclusions with regard to one subsection of 23 Pa.C.S.A. § 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Termination is a two-step process, in which a trial court first must determine whether the grounds under subsection (a) are met, and

- 17 -

then it must consider subsection (b). ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). The focus in terminating parental rights under section 2511(a) is upon the parent, while section 2511(b) focuses upon the child. ***Id.*** at 1008.

Because we need only affirm the trial court's decision as to one subsection of 2511(a), we focus upon subsection (a)(1). When considering that subsection, "we are instructed that we may not consider any effort by the parent to remedy the conditions described in subsection[] (a)(1) . . . if that remedy was initiated after the parent was given notice that the termination petition had been filed." ***In re D.W.***, 856 A.2d 1231, 1234 (Pa. Super. 2004).

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination.
>
> Further, Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties.

*In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998) (citations omitted)) (emphasis in original).

Parental duties have been defined as follows:

Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his . . . ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re Z.P.*, 994 A.2d 1108, 1118-19 (Pa. Super. 2010).

Here, in the six months preceding the termination petition, Mother had moved to Washington, D.C. and had no physical contact with Children. Mother made a few phone calls in July and August of 2014, but did not visit with Children in person until September 12, 2014. Mother went four months without seeing Children. After returning to Pennsylvania and reestablishing

contact with Children, Mother continued to miss visits and court proceedings. The trial court determined that, in the six months preceding the filing of the petition, Mother only saw Children five times. T.C.O. at 27.

Mother continued to experience instability with her housing and employment. While there is evidence that Mother recently had more stability in her housing, that occurred post-petition and we may not consider it. *See D.W.*, *supra*. Further, there was no evidence that Mother was involved in Children's medical treatment or that she provided court-ordered financial support beyond that required to keep Mother from being jailed for contempt.

Mother has cited her depression over her daughter's death to explain why she failed to maintain contact with Children. Mother's Brief at 19-22. While sympathetic to Mother's loss, mental health counseling and medication management were recommended to Mother on more than one occasion and Mother refused to participate. Even when Mother experienced some relief from symptoms while on medication during her incarceration, Mother chose not to continue the medication regime upon her release.

Based upon the evidence, the trial court concluded that Mother had not acted affirmatively to maintain her relationship with Children and had not used all resources available to her to overcome the obstacles to that relationship. The record supports the trial court's conclusion and the trial court did not abuse its discretion in finding that ACCYS had met its burden of proving section 2511(a)(1).

Mother's remaining issues contest the trial court's finding that termination of her parental rights was in Children's best interests. Mother argues that she provided testimony that she has a bond with Children. Further, Mother asserts that Foster Parents have alienated Children from her by not talking about Mother to the Children and permitting Children to call them mom and Dad. Further, Mother asserts that Foster Parents are of "advanced age" and have a plan for who will care for Children if Foster Parents are no longer able to do so. Mother argues that, because she has no physical impediments to caring for Children, it is in their best interest to be returned to her care. Mother's Brief at 26-28.

The trial court determined that there was no beneficial bond between Children and Mother, but that a strong bond existed between Children and Foster Parents. T.C.O. at 28-29. D.Y.S. became upset when hearing about Mother, was reluctant to visit Mother, and, when asked by Mother, stated that he did not want to live with her. The caseworker testified that, at one home visit, she observed D.Y.S. become upset at the mention of Mother's name. Notes of Testimony ("N.T."), 4/13/2015, at 70. E.M.S. was never in Mother's sole custody, and Mother only resided in the Foster Parents' home with him for a short time. Conversely, Children's needs are met by Foster Parents. There was testimony opining that Children are bonded with Foster Parents and look to Foster Parents to care for them.

As to Mother's contention that her testimony regarding alienation should have been given more weight, we must defer to the trial court's

credibility determinations and decisions regarding what evidence to believe. **See M.G.**, *supra*. Here, the trial court did not put great weight on Mother's testimony in that regard, and we will not disturb that conclusion. As to Foster Parents' age, Foster Mother testified that she and Foster Father were sixty-one years old. N.T. at 124. While Foster Parents intended to raise Children, they made plans for their daughter to take Children should anything happen to Foster Parents after Children are adopted that would prevent them from caring for Children.[2] **Id.** at 117, 124. There was no indication of any current health concerns with Foster Parents, and the plan they made was similar to that made by many parents regardless of age. Given the bond between Children and Foster Parents and the lack of any current impediment to caring for Children, their age did not preclude the trial court from finding that it is in Children's best interest to terminate Mother's parental rights.

The record supports the trial court's conclusions regarding Children's best interest. The trial court did not abuse its discretion in finding that section 2511(b) was satisfied.

Order affirmed.

---

[2]    Foster Parents also have a six-year-old adopted child. N.T. at 101.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/6/2015</u>